**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**UNITED STATES OF AMERICA,**

v.  Case No. 8:12-cr-205-T-17MAP

**NATHANIEL HARRIS,** *et al.*
_____/

**REPORT AND RECOMMENDATION**

THIS CAUSE is before the undersigned on the **Objection filed by Defendant Napoleon Harris** (Doc. 1022); the **Objection filed by Defendant Jerry W. Green, Jr.** (Doc. 1023); and **Objection filed Defendant Deonte Martin** (Doc. 1038), which have been construed as motions for reconsideration of the Report and Recommendation filed on July 25, 2016 (Doc. 1017). A rehearing on these matters was conducted on July 28, 2016.

For the reasons set forth herein, I recommend that the construed motions for reconsideration (Docs. 1022, 1023, and 1038) also be **denied.**

**I.**

On July 21, 2016, the undersigned conducted a hearing on Defendant Napoleon Harris's Amended Motion to Suppress Evidence Resulting From Use of Cell Site Simulator (Doc. 980), as joined and supplemented by Defendants Deonte Jamal Martin (Doc. 991) and Jerry W. Green, Jr. (Doc. 992). In short, Defendants contended that law enforcement officers from Manatee County conducted illegal realtime tracking of their cell phones. They urge all such realtime tracking evidence and evidence derived therefrom should be suppressed. The Government opposed. (Doc 990).

Following the hearing, the Government submitted an additional response claiming that

Napoleon Harris's motion to suppress was moot. (Doc. 1010). The same day, Napoleon Harris filed a Second Motion to Suppress, disputing the mootness argument asserted by the Government. (Doc. 1012). The single page motion argued (in full) that:

> [T]o the extent the Government intends to introduce evidence that it characterizes as 'historical cell tower sector data' the issue is not moot because those records are only 'historical' as a result of the constitutional violation that occurred when agents accessed the Sprint L-site and archived the precise geographic information. Thus, the government's characterization of the archived data as 'historical' is a direct and derivative use of the constitutional violation, which is impermissible under *United States v. Lambis*, ___ F. Supp. 3d___, Docket No. 15-cr-00734-WHP (N.D.N.Y., Jul. 12, 2016).

*Id.*

I issued a Report and Recommendation on July 25, 2016, finding, in pertinent part, that the Defendants failed to establish standing to contest the searches at issue and recommending that the motions to suppress be denied. (Doc. 1017). The recommendation was based largely on the factual finding that "Defendants point only to the detectives' assertions in the pen/trap applications suggesting the Defendants' association with the cell phones at issue" and that such was inadequate to establish standing. *Id.* at 8.

Napoleon Harris now argues that my conclusion of no standing is incorrect because the pen/trap applications attached to the amended motion to suppress were not just a government "theory" of possession, but were based on sworn testimony of the officers who signed the applications attesting that the phone numbers at issue belonged to Napoleon Harris. He urges that the fact that each of the orders issued by the state court judge expressly named Napoleon Harris as a target of the data to be obtained by law enforcement agents is dispositive of the standing issue. Citing *United States v. Sereme*, No. 2:11-CR-97-FTM-29SPC, 2012 WL 1757702, at *9 (M.D. Fla. 2012), *report and recommendation adopted,* 2:11-CR-97-FTM-29SPC, 2012 WL 1757271 (M.D.

Fla. 2012), *aff'd sub nom. United States v. Hyppolite*, 609 Fed. App'x. 597 (11th Cir. 2015), Harris argues that the proper framework for standing is that of "aggrieved person" under the Stored Communications Act (SCA), 18 U.S.C. § 2701, *et seq*. He contends that because the orders were directed at tracking his movements, he is an aggrieved person with standing to challenge the searches. Finally, Harris disputes the applicability of the cases cited by this Court and argues that the cases actually support his assertion of standing. (Doc. 1022).

Jerry Green has also objected to the Report and Recommendation, arguing the undersigned erred in finding that he relied solely on the detectives' statements in the pen/trap applications to show possession, use, or control of the cell phones. Rather, he notes that he stated in his motion that the cell phone number 941-840-9395 was his number.[1] Further, he claims that the applications indicated that this cell phone and two others cell phones were obtained by law enforcement from a vehicle previously driven by Defendant, which evidences his possession. Moreover, Detective Petta testified that realtime location information for cell phone number 941-405-2828 had been used to track Defendant on at least one occasion and led to his arrest. Green claims that this constitutes "other evidence" upon which his standing is based. Moreover, he claims that he never disclaimed the cell phones, the Government never presented any evidence that he disclaimed an interest, and merely using an alias for the subscriber does not automatically deprive him of an expectation of privacy. Finally, Defendant Green asserts that the undersigned erred in focusing on standing in the first place. Because law enforcement used the cell phone signals to physically track and locate him, he argues such is a search requiring a warrant based on probable cause. (Doc. 1023).

---

[1] Though not presented in the motion or at the prior hearing, Defendant Green now claims that this number was actually registered to his girlfriend, Tiana Lyle.

3

Deonte Martin filed an objection to the Report and Recommendation as well. Martin relies on the precedent presented by Napoleon Harris, asserting that "it is apparent that the court must revisit Defendant Martin's Motion to Suppress and Adoption of Napoleon Harris' Motion to Suppress."[2] (Doc. 1038).

The Government responds once again asserting that it does not intend to present any real time cellular location information against Defendants Harris or Green regarding the murder of Carlos Jurado. Rather, it only plans to present cell tower sector data, which consists of business records of Sprint and thus is not subject to the proscriptions of the Fourth Amendment. The Government urges that *Sereme* is distinguishable on this basis and factually and it cites instead *United States v. Davis*, 785 F.3d 498, 511 (11th Cir. 2015) for the proposition that a defendant does not have standing to challenge production of phone records containing cell tower information and that such production does not violate the Fourth Amendment. With regard to Jerry Green, the Government asserts that he has no standing with respect to the number 941-405-2158, because there was no subscriber and the account was billed to "LOL LOL."[3] Apart from asserting that it will not introduce realtime location information against Green, the Government does not specifically address the 941-840-9395 number in its response. As for Deonte Martin, the Government claims it does not intend to present any location information at all for the cellular telephone bearing number 941-405-2330 for the Jurado murder. Rather, it has merely introduced phone toll records showing that a

---

[2]Martin further argues that, despite the Government's contention at hearing that his standing has already been addressed by a prior Report and Recommendation from Judge Pizzo (Docs. 734, 811), the standing addressed previously is a separate consideration from the instant dispute. I believe Martin correct in his assertion.

[3]This phone number appears a typo as Green challenges only the 941-840-9395 and the 941-405-2828 numbers.

cellular telephone in use by the shooter, Jerry Green, was in contact with 941-405-2330 shortly after the murder.[4] Regardless of these Defendants' standing, the Government argues that the Stored Communications Act does not provide for suppression of evidence for any alleged wrong. (Doc. 1035).

## II.

For the following reasons, the motions should be denied.[5]

### A.

### Mootness as to Defendants Napoleon Harris and Jerry Green

As a preliminary matter, the motions to suppress are moot as to Defendants Napoleon Harris and Jerry Green. The Government has repeatedly and unequivocally stated that it will not introduce realtime location information obtained on these pen/trap applications as against these two Defendants on the Jurado murder.

While I continue to agree with the Defendants that law enforcement's seizure of precise realtime location information by monitoring signals from cell phones in this manner is a search subject to the proscriptions of the Fourth Amendment (*see* Doc. 1017 at 6), the realtime data is not being used by the Government against these two Defendants. Simply put, there is nothing to suppress.

---

[4]Though not addressed in its response, as discussed below, the Government stated at the hearing that does intend to use a small amount of realtime location information for this phone against Deonte Martin relative to the Coleman murder.

[5]It now appears that the Government's initial contention that these motions were untimely was accurate, given that a volume of this information was provided before the motion deadline. While this suggests the Defendant could have filed their motions consistent with the Court's deadline, given the Government's concession at the previous hearing, I find the timeliness argument was waived.

Instead, the Government proffers that it will only be using "historical cell tower sector data" against Harris and Green, which it has subpoenaed for trial. Under Eleventh Circuit precedent, the receipt of such business records is not a search, and Defendants have no standing to object on that basis. *See United States v. Davis*, 785 F.3d 498, 511 (11th Cir. 2015). Regardless of the issues surrounding the realtime tracking information obtained under these pen/trap applications, the Government demonstrates such will not be used against Harris or Green.

To the extent Defendant Harris argues in his Second Amended Motion to Suppress that the issues are not moot as to him because the historical cell tower records to be used by the Government "are only 'historical' as a result of the constitutional violation that occurred when agents accessed the Sprint L-site and archived the precise geographic information" (Doc. 1012), the argument is unpersuasive. As clarified at the rehearing, the Government obtained this historical data from three separate sources – through the applications appended to Defendants' instant motions; through separate § 2703 application(s); and in addition it has subpoenaed a representative of Sprint to bring the records for testimony at trial. While defense counsel speculates that any separate § 2703 application(s) relied upon tainted information obtained from the realtime cell phone searches, Defendant Harris has not provided the Court with copies of such application(s) nor has any Defendant presented any evidence supporting the contention that such were tainted by the illegally seized realtime location data. Thus, I find Defendant's derivative use argument unsupported and unsubstantiated. On the available record, the historic cell tower data to be offered against Harris and Green is derived from an independent source untainted by any realtime search. As such, I find the motions to suppress moot as to Defendants Harris and Green.

Defendant Martin's circumstances are more problematic. For this Defendant, the

Government states that it does intend to introduce realtime location evidence against him. The Government proffers that it will present location evidence from "two pings" derived from the realtime search of the cell phone number 941-405-2330, which it will argue place Martin at or near the location of the Brent Coleman murder. Thus, I do not conclude that Defendant Martin's motion to suppress is moot and it should not be denied on that basis.

### B.

### Standing

As for Defendants Harris and Green, I stand by my conclusions made in the prior Report and Recommendation. They fail to demonstrate an actual/subjective expectation of privacy in the cell phones at the times of these searches. Instead, they rely upon the allegations set forth in the applications, which case law suggests is insufficient. A review of the allegations set forth in the pen/trap applications at issue follows.

**Napoleon Harris:**

In his Amended Motion to Suppress Evidence (Doc. 980), Napoleon Harris submits three pen/trap applications and the corresponding orders on same. (Docs. 980-1 - 980-6).

The first application, dated March 26, 2013, relates to phone number **941-405-2330**. (Doc. 980-1). In this application, the detectives link Harris to this cell phone number, asserting:

- The number has been called by some of the members of the criminal organization while in Manatee County Jail. In monitoring these jail phone calls, the co-affiant believes, based on the voice, that Napoleon Harris is the person utilizing the number. *Id.* at ¶ 6;

- The number was discovered in a cell phone phonebook as part of this investigation listed as "Pole," which is one of Napoleon Harris's street names. *Id.*

While not suggesting any link to Harris, the application suggests that the cell phone number has been linked to four other cell phones being monitored by law enforcement as part of law

enforcement's investigation. *Id.*

The second application, dated May 10, 2013, relates to phone number **941-545-8003**. (Doc. 980-3). In this application, the detectives link Harris to this cell phone number, asserting:

- The number has been called by some of the members of the criminal organization while in Manatee County Jail. In monitoring these jail phone calls, a co-affiant believes, based on the voice, that Napoleon Harris is the person utilizing the number. *Id.* at ¶ 6;

- The number was discovered in a cell phone phonebook as part of this investigation listed as "Pole," which is one of Napoleon Harris's street names. *Id.* at ¶ 11.

Again, the application generally suggests that the cell phone number has been linked to four other cell phones being monitored by law enforcement as part of its investigation. *Id.*

The third application, dated March 24, 2014, relates to phone number **941-448-4152.** (Doc. 980-5). In this application, the detectives link Harris to this cell phone number, asserting:

- Jerry Green, who is identified as a member of the organization and was incarcerated for murder, made three phone calls from jail to this number. In monitoring these jail phone calls, a co-affiant believes, based on the voice, that Napoleon Harris is the person utilizing the number. *Id.* at ¶ 6.

**Jerry Green:**

In support of his adopted motion to suppress, Jerry Green submits two pen/trap applications and the corresponding orders on same. (Docs. 992-2, 992-3).

The first application as to Green, dated May 2, 2013, relates to phone number **941-840-9395**. (Doc. 992-2). In this application, the detectives link Green to this cell phone number, asserting:

- On January 21, 2013, Jerry Green was arrested by St. Petersburg Police and provided this number to police as his cell phone number. *Id.* at ¶ 5.

The second application related to Green, dated May 6, 2013, relates to phone number **941-405-2828**. (Doc. 992-3). In this application, the detectives link Green to this cell phone number,

8

asserting:

- On April 10, 2013, Manatee County Sheriff attempted to conduct a traffic stop on a red Volkswagen, and the driver fled on foot to 529 32nd Ave. E. Jerry Green was found hiding in this residence. It is believed that Green was the driver of the rental car, but no one could identify him as the individual fleeing from the car. A search of the car revealed three cell phones, one of which, the target phone number (941-405-2828), remains active. *Id.* at ¶ 7;

- Since the Volkswagen was searched, the number remains active and is assigned to the same account holder. It is believed to be in the possession of Jerry Green. *Id.* at ¶ 8.

**Deonte Martin:**

The Application and Order referred to by Defendant Deonte Martin, dated July 12, 2013, and July 15, 2013, were not attached to his adopted motion, but were filed previously by the Government and are part of the record before the Court. (Doc. 637-1).

The application, dated July 12, 2013, relates to phone number **941-405-2330**. *Id.* In this application, the detectives link "Deonta Ackerman-Martin"[6] to this cell phone number, asserting:

- At the time a previous court order was granted, affiants believed that it was being used by Napoleon Harris. Since the last order, affiants have identified Deonta Ackerman-Martin, an associate of Napoleon Harris, as the person in control of this number. (Doc. 673-1 at ¶ 6);

- Recently, members of the Special Investigations Tactical Unit called the number and an unknown male answered the phone. The male agreed to sell narcotics to the detective, and the deal was captured on audio/video. The male selling narcotics was identified as Martin. Three such deals have occurred by calling this number and Martin was identified as the person selling the narcotics each time. *Id.* at ¶ 7.

**The Suppression Hearings:**

At hearing on July 21, 2016, Detective Joseph Petta, the co-affiant on each of the applications was the only witness called. I previously summarized Detective Petta's testimony as

---

[6]According to the Second Superseding Indictment (Doc. 82), Deonta Jamal Akerman Martin and Deonta Martin are aliases used by Deonte Jamal Martin.

follows:

> Detective Petta testified that law enforcement obtained pen/trap authorizations for the cell phone numbers at issue in order to obtain precise realtime location information that was used to track the whereabouts of these phones, to identify those associated with Defendants, and to identify locations of interests. He denies use of a Stingray or similar device, but acknowledges that he used a website offered to law enforcement by Sprint (the "L-site") to obtain such information. Such realtime information was available every fifteen minutes twenty-four hours a day. He further acknowledges that law enforcement used the realtime information to track the cellular phones, which they believed were used by this group. By his account, such applications were the usual way to obtain such realtime location information at the time these applications were submitted.
>
> ***
>
> According to Detective Petta, the website allows law enforcement to log on and obtain realtime or contemporaneous and highly precise longitudinal and latitudinal information linked to GoogleMaps. A spreadsheet of all such location data is made available to law enforcement. Detective Petta testified that the pen/trap orders were not used for any other purpose than to obtain the realtime location of the cell phones.

(Doc. 1017 at 3-4).

The averments in the various pen/trap applications were not challenged. No exhibits were admitted into evidence, and none of the Defendants testified.

At the rehearing on July 28, 2016, counsel for Defendants essentially repeated their prior contentions and arguments. Napoleon Harris, citing the *Sereme* decision and the Stored Communications Act, 18 U.S.C. § 2711, urged that he is an "aggrieved person" by reason of being identified as the person against whom the realtime location information under these pen/trap applications was sought and thus he has standing. Defendants Green and Martin adopted this argument. Mr. Green urged the pen/trap applications provided more specific information to link him to the cell phones attributed to him. So did Mr. Martin.

The Government reiterated that it does not intend to introduce any realtime location

10

information for Defendants Napoleon Harris or Jerry Green. In relation to these two Defendants, it seeks only to introduce the historical cell tower sector data. It urged that the *Sereme* decision is distinguishable on its facts and that *United States v. Davis* is controlling regarding its access and use the historical cell tower data. Moreover, it asserts this evidence is not derivative evidence from the realtime tracking of the cell phones but will be introduced by a witness from Sprint who has been subpoenaed to bring such historical records with him/her to the trial.

With regard to Defendant Martin, the Government proffered that it does intend to present select realtime location data related to "two pings," which they urge will place Martin at or near the location of the Brent Coleman murder. Hedging on its prior concession, it now suggests that the application relating to the phone associated with Defendant Martin may provide probable cause for a realtime search[7] and in any event the good faith exception applies.

Again, no exhibits were admitted into evidence at the rehearing and none of the Defendants testified.

**Standing as to Defendants Harris and Green:**

As for Defendants Harris and Green, in addition to the mootness issue addressed above, the renewed arguments on standing are unpersuasive.

First, despite urging to the contrary, they both rely solely on the averments in the pen/trap applications to establish their standing. As previously noted, the burden is on the defendant to show

---

[7]Previously, the Government conceded the pen/trap applications did not provide probable cause.
Counsel for Defendant Martin conceded at July 28, 2016, hearing that the allegations in the application relating to Martin were stronger, but stopped short of stating that such would support probable cause. Regardless, he claims that the issuing court did not review the application in the context of a probable cause determination and the good faith exception would not apply.

11

his actual expectation of privacy in the matter searched. Neither Defendant offers other evidence to show that at the time of these searches they had an actual expectation of privacy in the cell phones. The averments in the applications show only that at one time they used or may have used one of more of the cell phones. Considering all the circumstances, I find these averments insufficient to show Defendants use of or connection with the cell phones during the period of these searches. Moreover, as discussed below, the *Sereme* decision is instructive and demonstrates that these averments alone are insufficient.[8]

As for these Defendants' argument that they have standing because they were the express target of the intended searches and accordingly are "aggrieved persons" under the SCA, I read the law differently.

Defendants claim that they are "aggrieved parties" under the SCA and thus have standing to seek the exclusion of the realtime location evidence from the illegal searches. However, such conclusion does not follow and is unsupported by the law. Pursuant to the SCA, an "aggrieved person" as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). Here, neither Defendant demonstrates that they were a party to such intercepted communication. They can claim that they were the *target* of the inception, but that alone is not enough to show standing under the Fourth Amendment.

"Under the SCA, a victim of improper data collection has several remedies available, but suppression of evidence is not one of them. *See* 18 U.S.C. §§ 2707, 2708, 2712." *United States v.*

---

[8]As for Defendant Green, he admits one cell phone is his girlfriend's and, contrary to his argument, the anecdotal information about the red VW suggests that he was attempting to separate himself from the cell phones found in the car after he apparently fled the vehicle and hid from the police.

*Madison*, No. 13-14541, 2016 WL 692106 at *1 (11th Cir. Feb.22, 2016) (citing *United States v Thompson,* 936 F.2d 1249, 1251(11th Cir. 1991) for the proposition that "unless the statute at issue provides for exclusion, we do not apply the exclusionary rule to non-constitutional violations of law"). Here, Defendants seek to exclude evidence seized in an illegal search. That remedy is not found in the SCA, but rather in the Fourth Amendment. To prevail on such remedy, a defendant must demonstrate both his standing and an illegal search, consistent with the Fourth Amendment law.

> As explained by the district court in *United States v. Martin*:
>
> > Section 2518(10)(a) of Title III states that any "aggrieved person" may move to suppress the contents of any wire or oral communication intercepted pursuant to Title III, *or any fruits derived therefrom,* on the grounds that the communication was unlawfully intercepted or was not made in conformity with the authorizing order. 18 U.S.C. § 2518(10)(a)(I)-(iii). An "aggrieved person" for Title III purposes is one who is either (1) a party to any intercepted communication, or (2) a person against whom the interception was directed. *Id.* § 2510(11). Although Title III contains this express standing provision, courts have long recognized that Congress's intent was to apply the existing law of Fourth Amendment standing to wiretap cases. *United States v. Scasino,* 513 F.2d 47, 50 (5th Cir. 1975) (quoting *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)); *see* S.Rep. No. 1097, 90th Cong., 2d Sess. Relying on this Congressional intent, courts continue to construe Title III standing in accordance with standing requirements applied to suppression claims under the Fourth Amendment. *See, e.g., United States v. Gallo,* 863 F.2d 185, 192 (2d Cir.1988) (citing *Alderman,* 394 U.S. at 175-76 & n. 9, 89 S.Ct. at 967–68 n. 9; S.Rep. No. 1097, 90th Cong., 2d Sess). Accordingly, one does not become an "aggrieved person" under Title III solely by the introduction of damaging evidence. *United States v. Garcia,* 1991 WL 120239 (S.D.N.Y. June 21, 1991) (citing *Gallo,* 863 F.2d at 192; *Alderman,* 394 U.S. at 171-72, 89 S.Ct. 961). *But see United States v. Marcello,* 508 F.Supp. 586, 602 n.6 (E.D. La. 1981).

169 F. Supp. 2d 558, 563-64 (E.D. La. 2001).

Defendants claim to be aggrieved person because they were the target of illegal searches. But the target theory of standing was long ago rejected by the Supreme Court. *See Rakas v. Illinois*,

439 U.S. 128 (1978) (rejecting a target theory and setting forth a standard requiring the defendant to establish a legitimate expectation of privacy). In sum, while these Defendants were intended targets of the realtime tracking, such does not confer standing under Fourth Amendment principles and the SCA provides them no relief.

The decision in *United States v. Sereme* does not dictate a different conclusion. First, the facts in *Sereme* are significantly distinguishable. In that case, realtime tracking of a cell phone was accompanied by realtime investigation by law enforcement. That investigation lead to a traffic stop of a vehicle in which Sereme and the cell phone were located. A search of Sereme's person lead to the discovery of cocaine. On his later motion to suppress, the court there found standing by reference to the SCA. But by any reasonable reading the facts, the ruling on standing was correct under the Fourth Amendment. The relationship between the seizure of realtime location information, the stop of the vehicle carrying Sereme and the cell phone, and the further seizure of drugs was patently clear. While the court found standing by reference to the SCA and the conclusion that Sereme was an aggrieved person thereunder, the conclusion was entirely consistent with Fourth Amendment principles. Given the significantly different facts in the instant case, I do not find *Sereme* as authority for finding of standing in this matter.

In sum, I stand by my initial determination that Defendants Harris and Green lack standing.

**Standing as to Defendant Martin:**

Defendant Martin's standing is, upon further review, a closer matter. As noted above, the later pen/trap application on the 941-405-2330 phone number demonstrated Martin's use of the cell phone in connection with three undercover drug sales shortly before the application. The seizure of the realtime location information was later found to place the phone in the vicinity of the Coleman homicide, and the Government intends to argue at trial that the circumstances indicate the phone was

carried/used by Martin at the time. In these circumstances, I think that the Government is hard-pressed to deny standing, and I think it best to recede from my earlier conclusion as to Martin on the matter of standing.

However, as addressed below, the ultimate conclusion that the motion to suppress should be denied remains unchanged. As suggested in my prior Report and Recommendation (Doc. 1017), the Government argues that even if the Defendants have standing and even if the search violated the Fourth Amendment, suppression of the evidence is inappropriate because the officers acted in good faith on authorizations from judges made consistent with the established practice at that time.

## C.

### The Good Faith Exception

The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect...." *United States v. Calandra*, 414 U.S. 338, 348 (1974). As now understood and applied, the exclusion of evidence is an "extreme sanction" to be used only as a "last resort." *Herring v. United States*, 555 U.S. 135, 140 (2009). Thus, a Fourth Amendment violation, in and of itself, does not require necessarily the exclusion of evidence. *Id.* "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144. "[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct...." *Id.* Moreover, there are exceptions to this judicially created remedy and one such exception to exclusion is the *Leon* good faith exception.

In *United States v. Leon*, 468 U.S. 897, 922 (1984), the Supreme Court concluded that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs

of exclusion." Thus, an officer's objectively reasonable reliance on a magistrate's determination of probable cause will render the application of the of the extreme sanction of exclusion inappropriate.

The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances ... may be considered." *Id.* at 922, n.23.

*Leon*'s good faith exception does not apply where: (1) the magistrate judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) the issuing magistrate judge wholly abandoned her judicial role; (3) the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) depending upon the circumstances of the particular case, a warrant is so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid. *United States v. Robinson*, 336 F.3d 1293, 1296 (11th Cir. 2003); *United States v. Martin*, 297 F.3d 1308, 1312-13 (11th Cir. 2002).

Pertinent to this case, courts have extended the good faith exception to situations where officers are called upon to interpret or rely upon an external source of authority such as a statute, which later turns out to be invalid or not to authorize the action taken. *See, e.g., Illinois v. Krull*, 480 U.S. 340, 349-50 (1987); *United States v. Williams*, 622 F.2d 830, 844 (5th Cir. 1980) (en banc). In addition, a number of courts, including the Eleventh Circuit, have determined that the *Leon* good faith exception applies to those searches conducted on an order rather than warrant. *See United States v. Davis*, 785 F.3d 498, 518, n.20 (11th Cir.), cert. denied, 136 S. Ct. 479, 193 L. Ed. 2d 349

(2015) ("In the alternative, we hold that the prosecutors and officers here acted in good faith and therefore, under the well-established *Leon* exception, the district court's denial of the motion to suppress did not constitute reversible error"); *United States v. Katzin*, 769 F.3d 163, 167 (3d Cir. 2014), cert. denied, 135 S. Ct. 1448 (2015) (*en banc*); *United States v. Cooper*, No. 13-CR-00693-SI-1, 2015 WL 881578, at *3 (N.D. Cal. Mar. 2, 2015); *United States v. Alvarez*, No. 14-CR-00120-EMC, 2016 WL 3163005, at *5 (N.D. Cal. June 3, 2016); *United States v. Giddins*, 57 F.Supp.3d 481, 495 (N.D. Md. Sept. 30, 2014).

The Government bears the burden of demonstrating the applicability of the *Leon* good faith exception. *See United States v. Travers*, 233 F.3d 1327, 1331 n.2 (11th Cir. 2000).

At the hearing, the Government argued that the *Leon* good-faith exception would apply in these circumstances. That is, the Government argued that despite the lack of warrant and showing of probable cause, the officers here acted in good faith upon orders issued by the state court in accordance with the established standard. Thus, they claim the exclusion of evidence in the circumstances is unwarranted.

In response to this argument, Defendant Harris's counsel urged that these officers knew full well that tracking devices required a warrant[9] and they acted with intentional bad faith to bypass the warrant requirement by using the pen/trap applications as a vehicle for court approval for conducting illegal searches.

As discussed above, the objectively ascertainable question is whether a reasonably well trained officer would have known that the search was illegal despite the state judges' authorization.

---

[9] The *Jones* decision by the Supreme Court, cited in the initial Report and Recommendation, was issued in 2012 and made clear that realtime GPS tracking of automobiles was a search requiring a warrant. *United States v. Jones*, 132 S.Ct. 945 (2012).

17

Based on the record before the Court, I am obliged to conclude the officers would not have known that the seizures of realtime location information in this fashion pursuant to pen/trap authorizations were illegal. At the time of these applications, neither the Florida Supreme Court nor the United States Supreme Court had explicitly spoken on this issue.[10] Indeed, the U.S. Supreme Court still has not weighed in on this type of tracking.

According to Detective Petta's testimony at the July 21 hearing, the realtime authorizations were obtained in the usual way and in accordance with the established practice in that circuit at that time.[11] While Defendants argue to the contrary, they offer no contrary evidence, and I am obliged to find the detective's testimony supports a finding of good faith.

Furthermore, none of the exceptions to the *Leon* good faith doctrine apply here. First, there is no indication that the factual allegations in the application are false or demonstrate reckless disregard for the truth. Second, there is no indication that state court judges abandoned their detached and neutral role. Third, the Government was not dishonest or reckless in preparing its application. Law enforcement could hold an objectively reasonable belief that the orders were valid because case law arguably supported the Government's position at the time that it sought the order. *Cf. United States v. Brunette*, 256 F.3d 14, 19-20 (1st Cir. 2001) (finding reliance on a warrant was objectionably reasonable where the state of the law was uncertain). And finally, applying the

---

[10]As this Court noted previously, the Florida Supreme Court decided *Tracey v. Florida*, 152 So. 3d 504 (Fla. 2014) after the applications and orders at issue here. *Tracey* expressly addressed the realtime monitoring of cell site location information and held that the use of this location information in order to track him in real time was a search within the purview of the Fourth Amendment.

[11]Such appears no longer the practice. As the detective acknowledged, the Florida Supreme Court's subsequent decision in *Tracey* requiring a warrant for realtime cell phone tracking now dictates the practice.

standard that the officers apparently believed was sufficient, the applications were not so facially deficient that they could not reasonably presume it to be valid.

As such, assuming *arguendo* that all three of these Defendants here establish standing, the *Leon* good faith exception applies and dictates that their motions to suppress be denied.

## III.

Accordingly, for the reasons stated above, I **RECOMMEND** that the construed motions for reconsideration (Docs. 1022, 1023, and 1038) be **DENIED.**

                                            Respectfully submitted on
this 31st day of July 2016.

                                            THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO PARTIES OF EXPEDITED OBJECTION PERIOD

Failure to file written objections to the proposed findings and recommendations contained in this report within **two** days (or as otherwise directed by the district judge) from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal. 28 U.S.C. § 636(b)(1).

Copies furnished to:
The Honorable Elizabeth A. Kovachevich, United States District Judge
Counsel of record